# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-01456-SCT

*HEARTSOUTH, PLLC F/K/A HUBSOUTH*
*CARDIOLOGY*
*v.*

*TIMOTHY BOYD, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/30/2002 |
| TRIAL JUDGE: | HON. SEBE DALE, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | EDMUND L. BRUNINI |
| | STEPHEN J. CARMODY |
| ATTORNEYS FOR APPELLEE: | JAMES LAWTON ROBERTSON |
| | BRENDA CURRIE JONES |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 11/20/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE McRAE, P.J., EASLEY AND CARLSON, JJ.

## McRAE, PRESIDING JUSTICE, FOR THE COURT:

¶1.	HeartSouth, PLLC, f/k/a Hubsouth Cardiology (Heartsouth), filed a complaint in the Chancery

Court of Lamar County, Mississippi, against Timothy Boyd, M.D., for damages, injunctive relief, and a

declaratory judgment alleging that Dr. Boyd violated the terms of a physician employment agreement,

specifically the covenant not to compete/not to solicit. Boyd filed a motion to dismiss pursuant to Rule

12(b)(6) of the Mississippi Rules of Civil Procedure claiming that by the very language of the physicians

employment agreement, their contractual relationship had expired with no renewal being executed; therefore

the covenant not to compete/not to solicit was inapplicable and/or in the alternative the one year time period of the covenant not to compete/not to solicit had expired sixteen days before the filing of the Complaint. The chancery court granted Boyd's motion to dismiss. Aggrieved, HeartSouth, PLLC appeals to this Court and presents the following issues for review: (1) Did the chancery court err in finding that the physicians employment agreement had in fact expired; (2) Did the chancery court err in granting the Rule 12(b)(6) motion to dismiss; and (3) Even assuming the chancery court's ruling was that of a Rule 56 motion for summary judgment, did the chancery court err in finding that there existed no issues of genuine material fact. We find that: (1) the chancery court did not err in granting the motion to dismiss; (2) the chancery court did not err even assuming the chancery court treated the motion as a Rule 56 motion for summary judgment; (3) the physicians employment agreement had in fact expired with no renewal; and (4) by the language of the physicians employment agreement, the covenant not to compete/not to solicit did not survive the agreement's expiration.

## FACTS AND PROCEDURAL HISTORY

¶2.      Dr. Timothy Boyd ("Boyd"), a Mississippi native, is a board certified physician as a specialist in cardiology. In the Fall of 1999, Boyd was employed as a cardiologist at the Northeast Arkansas Clinic in Jonesboro, Arkansas. He was approached by Dr. Alan Covin ("Covin"), the manager and only member of HeartSouth, PLLC ("HeartSouth"), a cardiology clinic with locations in south Mississippi. Covin made certain promises to Boyd concerning his eligibility for partnership in HeartSouth after the completion of his one year employment contract.

¶3.      Boyd and HeartSouth entered into a physicians employment agreement ("employment agreement") on October 15, 1999. The employment agreement, in relevant part, provides:

PHYSICIANS EMPLOYMENT AGREEMENT

2

This Physician Employment Agreement is made on the 15th day of October, A.D., 1999, by and between HUBSOUTH CARDIOLOGY, PLLC, a Mississippi professional limited liability company (hereinafter "Clinic") and JOHN TIMOTHY BOYD, M.D., (hereinafter "Physician"). . .

1. TERM

Physician agrees to employment with Clinic and to actively pursue a medical practice in the Hattiesburg, Mississippi area **for a period of one (1) year beginning on April 1, 2000** (hereinafter the "Effective Date") . . .

10. TERMINATION

This Physicians Employment Agreement shall be terminated upon the happening of any of the following events:

A. Either party has breached or violated any provision of this Physicians Employment Agreement, provided, however, that the breaching party shall be given written notice of such alleged breach or violation and thirty (30) days within which to correct said breach or violations; . . .

F. Whenever the clinic and the Physician mutually agree to terminate in writing; . . .

J. Clinic or Physician may elect to terminate his Physicians Employment Agreement for any reason upon ninety (90) days written notice to the other party. . .

11. COVENANT NOT TO COMPETE/NOT TO SOLICIT

In order to further the legitimate business interests of Clinic and to protect the investment of Clinic in the development of its practice, although at the same time not preventing Physician from earning a livelihood, **Physician agrees that during the term of this Physician Employment Agreement and for a period of one (1) year immediately following either the voluntary termination by Physician or termination by Clinic of Physician's employment pursuant to this Physician Employment Agreement, with cause, the Physician shall not practice in his specialty of cardiology within a thirty (30) mile radius of any facility operated, owned, managed or served by Clinic during the term of this agreement.** Clinic and Physician agree that if any portion of this section is found by a Court of competent jurisdiction to be unreasonable or other unenforceable, any such portion shall nevertheless be enforceable to the extent such Court deems reasonable and it is the intent of the parties herein to request that the Court reform such portion in order to make

3

same enforceable. Physician further agrees that during the term of this Physician Employment Agreement and for a period of one (1) year immediately following the voluntary or involuntary termination of his employment pursuant to said Agreement, whether with or without cause, Physician shall not solicit any patient or employee of Clinic to follow Physician to his new practice. **In the event Clinic terminates this Agreement without cause, Physician terminates this Agreement due to breach by Clinic, of if this Agreement terminates by its own terms without Physician being allowed to become a Member of Clinic; then this covenant not to compete will not be enforced by Clinic and will be deemed null and void.**

12. <u>ELIGIBILITY TO PURCHASE MEMBERSHIP UNITS</u>

After Physician has completed the one (1) year term of this Agreement, then Physician shall be eligible for consideration for membership in HubSouth Cardiology, PLLC. . . .

16. <u>REMEDIES FOR BREACH</u>

The parties acknowledge that the breach of any term of this Physician Employment Agreement by either of the parties may cause immediate and irreparable injury to the other party for which there will not exist an adequate remedy at law. Accordingly, such aggrieved party shall be entitled to request injunctive relief and specific performance, and in any legal action for such remedies, the party against whom such action is instituted agrees not to assert and shall not be deemed to have waived the defense that an adequate remedy at law exists.

17. <u>WAIVER OF BREACH</u>

No waiver of the enforcement of any provision in this Physician Employment Agreement shall be deemed a continuing waiver. . . .

19. <u>MISCELLANEOUS PROVISIONS</u> . . .

D. Amendments

**This Physicians Employment Agreement constitutes the entire agreement of the parties and may not be changed orally, but only upon an amendment in writing signed by the parties hereto.**

(emphasis added).

¶4.     In the Spring of 2000, Boyd and his family moved to Hattiesburg, and he began work at HeartSouth on April 1, 2000. At the time of Boyd's employment, HeartSouth had clinics in Hattiesburg, Petal, McComb, and Wiggins.  Boyd worked for HeartSouth through the one year period provided in the employment agreement with no renewal contract ever being executed between the parties.  The one year expiration date of the contract was on March 31, 2001.  Despite the promises made by Covin, Boyd was never offered a partnership in HeartSouth and only received an increase in pay after one year.  Boyd became increasingly unhappy with his position at HeartSouth and began considering other employment options.

¶5.     In February of 2002, Covin was injured in an auto accident.[1]  Thereafter, Covin issued a memo to Boyd and other physicians employed by HeartSouth seeking suggestions concerning "ideas for membership" in HeartSouth.  Negotiations as to the "ideas of membership" then ensued.  After consulting an attorney, Boyd sent a letter to HeartSouth regarding what he believed to be events constituting "breach" of his initial employment agreement.

¶6.     On March 12, 2002, attorneys for Boyd and Mohinder P.S. Randhawa, Jr., M.D., sent a letter to  HeartSouth and Covin which specifically stated:

> We have considered the ideas you expressed and, after doing so, we can only respond that we do not find your proposals to be workable.
> Dr. Randhawa and Dr. Boyd intend to **discontinue** their association with HeartSouth, PLLC, and to establish their practice separate and apart from HeartSouth.

---

[1]  HeartSouth goes into great detail concerning the "horrific" auto accident and resulting injuries suffered by Covin.  HeartSouth also attempts to interject facts to support some sort of "conspiracy theory," whereby Boyd and another physician were attempting to take advantage of Covin's injured condition.  As these statements of fact are unreliable and irrelevant to the issues at hand, they will not be discussed.

(emphasis added).[2]  Two days later on March 14, 2002, Boyd sent a letter of resignation to Covin and HeartSouth effective March 18, 2002.  Thereafter, Boyd joined the Heart Center.  In response to Boyd's resignation and new employment, HeartSouth sent a certified letter on April 1, 2002, ordering Boyd to "cease and desist" because he was in violation of Section 11 of the employment agreement which provided for the covenant not to compete/not to solicit ("covenant").

¶7.     On April 16, 2002, HeartSouth filed a complaint in the Chancery Court of Lamar County against Boyd seeking damages, injunctive relief, and a declaratory judgment.  Exhibit A to the complaint was a copy of the employment agreement.  Exhibit B to the complaint was a copy of the certified cease and desist letter sent to Boyd on April 1, 2002.  That same day, HeartSouth also filed a motion for a preliminary injunction which also attached as exhibits the employment agreement and certified "cease and desist" letter sent to Boyd.

¶8.     On May 29, 2002, Boyd filed a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted.  Attached as exhibits to the motion included the employment agreement and a letter dated March 6, 2002 from HeartSouth to Boyd in response to Boyd's allegations that during the term of the employment agreement, HeartSouth had breached the contract.  In his motion, Boyd claimed that the employment agreement had expired and terminated by its own terms on March 31, 2001 and had not been renewed.  In support of his claim, Boyd pointed to the March 6, 2002, letter sent by HeartSouth's attorney in response to the allegations of breach which specifically stated:

> You stated in the first paragraph of your letter that you are "providing HeartSouth with notice of Dr. Boyd's intent to terminate the agreement if HeartSouth has not cured each of the following breaches" of the employment agreement.  Please be adviced that in Paragraph 1 of the Physician Employment Agreement (the "Agreement"), it is provided that

---

[2]  Mohinder P.S. Randhawa, Jr., M.D., is not a party to this lawsuit.

6

the contract terminates one year form February 1, 2000. Accordingly, **the contract terminated on the date and the relationship that has existed between the parties since that day is that of "employment at will**."

(emphasis added).

¶9. On June 3, 2002, HeartSouth filed its first response to Boyd's motion to dismiss. Attached as exhibits to this response were excerpts from the deposition testimony of Boyd and the March 4, 2002, letter from Boyd's attorneys advising HeartSouth of Boyd's intent to "discontinue" their employment relationship. The thrust of HeartSouth's argument was that Boyd, by continuing to work at HeartSouth after the expiration of the one year term, subjected himself to continued enforcement of the contract. HeartSouth also filed an answer to the counterclaim and thirty-party complaint.

¶10. On June 10, 2002, HeartSouth filed its second response to Boyd's motion to dismiss and attached eight more exhibits. The eight exhibits included: (1) excerpts from the deposition testimony of Boyd; (2) an affidavit from Covin; (3) an affidavit from Dr. Dieter W. Schneider, M.D., a physician employed during and after Boyd's employment; (4) Minutes from a February 1, 2002, manager's meeting; (5) the February 14, 2002, memo from Covin to Boyd and other physicians employed by HeartSouth; (6) a February 20, 2002, letter from an attorney concerning review of the employment agreement; (7) the March 12, 2002, letter from Boyd's attorney informing HeartSouth of Boyd's intent to "discontinue" his employment relationship with HeartSouth; and (8) Boyd's March 14, 2002, resignation letter.

¶11. On July 12, 2002, the chancery court issued its memorandum opinion on Boyd's motion to dismiss holding that the employment agreement had in fact lapsed and had no legal effect; therefore an action for breach of contract, damages, and injunctive relief could not be maintained as a "valid and binding contract" did not exist. The chancery court reasoned that the employment agreement, by its own terms, provided for a one year contract with no provisions for renewal, extension, or holdover; therefore the contract

7

expired one year after April 1, 2000, or March 31, 2001. On April 16, 2002, when the complaint was filed, there did not exist a valid and binding contract between plaintiff and defendant upon which this action could be based. The chancery court found that the covenant was an "integral part" of the agreement which did not provide for severability. Alternatively, the chancery court found that, at most, if the covenant stayed in effect for one year after the agreement's lapse, the covenant still expired sixteen days before the lawsuit was filed. Soon thereafter, the chancery court issued a M.R.C.P. 54(b) certificate and judgment.

¶12.    Aggrieved, HeartSouth appeals to this Court.

## STANDARD OF REVIEW

¶13.    A Rule 12(b)(6) motion should not be granted unless it appears "to a certainty that the plaintiff is entitled to no relief under any set of facts that could be proved in support the claim." M.R.C.P. 12 cmt. We have stated that a Rule 12(b)(6) motion to dismiss "should not be granted unless it appears beyond a reasonable doubt that the Plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Butler v. Bd. of Supervisors for Hinds County*, 659 So.2d 578, 581 (Miss. 1995) (citations omitted). When reviewing the trial court's grant of a motion to dismiss pursuant to Rule 12(b)(6), this Court employs de novo review. *Tucker v. Hinds County*, 558 So.2d 869, 872 (Miss. 1990).

¶14.    As HeartSouth has also raised the possibility that the Rule 12(b)(6) motion may have been converted by the chancery court into a Rule 56(b) motion for summary judgment, the applicable standards for reviewing a Rule 56 summary judgment will also be discussed. A Rule 56(b) motion for summary judgment should not be granted unless "no genuine issues of material fact exist." M.R.C.P. 56(b). The moving party must be entitled to judgment as a matter of law, and "the burden of demonstrating that there is no genuine issue of material fact falls on the party requesting the summary judgment." *Mozingo v. Scharf*, 828 So.2d 1246, 1249 (Miss. 2002) (citing *Short v. Columbus Rubber & Gasket Co.*, 535

8

So.2d 61, 63-64 (Miss. 1988)). "The evidence is viewed in the light most favorable to the non-moving party." *Watts v. Tsang*, 828 So.2d 785, 791 (Miss. 2002) (quoting *Conley v. Warren*, 797 So.2d 881, 882 (Miss. 2001) (citations omitted)). When ruling on a trial court's grant or denial of a motion for summary judgment, we employ a de novo standard of review. *Id.* at 1249 (citing *Aetna Cas. & Sur. Co. v. Berry*, 669 So.2d 56, 70 (Miss. 1996)).

## DISCUSSION

### I. DID THE CHANCERY COURT ERR IN GRANTING DR. TIMOTHY BOYD'S RULE 12(B)(6) MOTION TO DISMISS?

¶15.    HeartSouth argues that the chancery court committed reversible error under this Court's holdings in *Palmer v. Biloxi Regional Medical Center, Inc.*, 649 So.2d 179 (Miss. 1994), and *Jones v. Regency Toyota, Inc.*, 798 So.2d 474 (Miss. 2001), by looking outside the complaint to other documents and evidence and thereafter ruling on Boyd's Rule 12(b)(6) motion to dismiss. HeartSouth further argues that it was improper for Boyd to attach as an exhibit to his motion to dismiss a March 6, 2002, letter from HeartSouth to Boyd regarding his decision to cease negotiations concerning a possible membership in HeartSouth.

¶16.    Boyd argues that the chancery court did not err in dismissing under Rule 12(b)(6). He argues that the chancery court did not have to look further than the complaint, since the employment agreement was attached the complaint for the court's review. He further argues that if any party improperly presented documentation and evidence which would cause the chancery court to look outside the complaint, it was HeartSouth.

¶17.    First, HeartSouth complains that the chancery court erroneously looked outside of the complaint when ruling upon the Rule 12(b)(6) motion. It is true that according to Rule 12(b)(6) and (c), the chancery

9

court in ruling upon a motion to dismiss should not look outside the pleadings. M.R.C.P. 12(b)(6) & (c).

HeartSouth argues that every time a trial court considers evidence and documentation outside of the complaint when ruling upon a Rule 12(b)(6) motion, then a reversible error has been committed under this Court's holding in *Jones*, 798 So.2d 474. Suffice it to say that HeartSouth's understanding of *Jones* is limited. As far as looking outside the pleadings, HeartSouth is in no position to complain. HeartSouth is the very one who submitted a total of ten exhibits with its two responses to the motion to dismiss. It is more than a little hypocritical for HeartSouth now to complain about the presentation of Boyd's two exhibits with his motion to dismiss when it submitted ten exhibits for consideration which included some fifty-three pages of excerpts from Boyd's deposition testimony.

¶18.  HeartSouth attached the employment agreement to the complaint as an exhibit. The chancery court was free to review the employment agreement and look at its terms and provisions.  Rule 10(c) of the Mississippi Rules of Civil Procedure provides that, "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." M.R.C.P. 10(c). Since the employment agreement as an "exhibit" to the pleading is a "part thereof," the chancery court was free to review the agreement in ruling upon a Rule 12(b)(6) motion to dismiss. Upon examination of the employment agreement, it is not hard to see why the chancery court found that a Rule 12(b)(6) motion was proper for failure to state a claim upon which relief may be granted.

¶19.  Second, HeartSouth argues that the chancery court must take as true the specific allegations made in the complaint that "there is a valid and enforceable contract." This is not so. The chancery court is only obliged to take the "factual" allegations made in the complaint as true, not the "legal" allegations made in the complaint. *Tucker v. Hinds County*, 558 So.2d 869, 872 (Miss. 1990) (citing *Davidson v. Georgia*, 622 F.2d 895, 897 (5th Cir. 1980)). The chancery court had the employment agreement for review and

10

was not obliged to ignore the plain language of the employment agreement and instead accept the unsubstantiated allegations of HeartSouth's legal claims. Furthermore, the arguments made by HeartSouth concerning an "implied renewal" of the employment contract and/or an employment contract based on "the parties actions" are not supported by case law in this State. This State has never recognized an employment contract based on inferences from "party actions" or "implied renewal." Such a holding would be contrary to the "employment at will" doctrine and the parol evidence rule which are the established precedent on the issue. *See **McArn v. Allied Bruce-Terminix Co.,*** 626 So.2d 603 (Miss. 1993); ***Housing Auth., City of Laurel v. Gatlin***, 738 So.2d 249 (Miss. Ct. App. 1998). As will be discussed further in greater detail, the employment agreement which was presented to the chancery court was not a valid enforceable contract as it had lapsed by its own terms without renewal over a year before the lawsuit was filed. As it is simple contract law that a valid and enforceable contract is required to maintain an action for breach of contract or injunctive relief thereon, the chancery court did not err by granting the Rule 12(b)(6) motion to dismiss. *See **Garner v. Hickman***, 733 So.2d 191, 195 (Miss. 1999).

¶20.    Third, HeartSouth argues that pursuant to Rule 408 of the Mississippi Rules of Evidence, the March 6, 2002, letter was a "compromise" and/or "settlement" letter which should not have been admitted into evidence. Rule 408 specifically provides that:

> Evidence of (1) furnishing or offering or promising to furnish; or (2) acceptance or offering or promising to accept, a valuable consideration **in compromising or attempting to compromise a claim which was disputed as to either validity or amount**, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such

11

as proving bias or prejudice of a witness, negativing a contention of undue delay, or providing an effort to obstruct a criminal investigation or prosecution.

M.R.E. 408 (emphasis added). Under the circumstances which existed on March 6, 2002, when this letter was prepared and executed, it is difficult to determine whether the letter is in fact a "compromise" and/or "settlement" letter or whether it was a letter merely relating to Boyd's decision to discontinue his employment relationship with Covin and HeartSouth. As of March 6, 2002, no controversy existed concerning Boyd's practice of medicine in violation of the covenant or in breach of contract. The letter is a response to Boyd's decision to leave the HeartSouth practice which occurred before any controversy concerning breach of contract occurred. The most significant passage in the letter, which tends to signify that indeed it is not a "compromise" and/or "settlement" letter, includes the following statements:

> Please be advised that in Paragraph 1 of the PHYSICIAN EMPLOYMENT AGREEMENT (the "Agreement") it is provided that the contract terminates one year from February 1, 2000. Accordingly, **the contract terminated on that date and the relationship that has existed between the parties since that day is that of "employment at will."**

(emphasis added). By its own statement, HeartSouth acknowledged that the employment agreement was no longer in force. At best, the letter can be characterized as mere "puffing" in an attempt by Covin and HeartSouth to downplay the significance of Boyd leaving the cardiology practice and any claims made by Boyd during negotiations for "membership" regarding his right and eligibility for membership in HeartSouth.

II. **ASSUMING THE CHANCERY COURT'S RULING WAS THAT OF A RULE 56 MOTION FOR SUMMARY JUDGMENT, DID THE CHANCERY COURT ERR IN FINDING THAT THERE EXISTED NO DISPUTED ISSUES OF GENUINE MATERIAL FACT?**

¶21. HeartSouth argues that if the chancery court's ruling merely amounted to a dismissal on the basis of summary judgment; then the chancery court committed reversible error by failing to follow the proper procedure for conversion of a Rule 12(b)(6) motion into a rule

56 motion for summary judgment. HeartSouth argues that according to this Court's rulings in *Palmer*, 649 So.2d 179, and *Jones*, 798 So.2d 474, the chancery court's treatment of the Rule 12(b)(6) motion like that of a Rule 56 motion amounts to reversible error. Lastly, HeartSouth argues that there exists disputed issues of material fact; therefore summary judgment was not appropriate.

¶22. Boyd argues that even if the chancery court erred in its conversion of the Rule 12(b)(6) motion into a Rule 56 motion; the Court still did not commit reversible error. Furthermore, Boyd argues that the facts in *Palmer* and *Jones* are distinguishable and the mandates of those holdings are satisfied despite the chancery court's failure to formally convert the motion properly.

¶23. As already stated in Issue I, based on the allegations contained in the complaint, the language of the employment agreement, and prevailing precedent concerning "at will employment" and parol evidence; the chancery court's order which granted Boyd's motion to dismiss was not error.

### III. DID THE CHANCERY COURT ERR IN FINDING THAT THE PHYSICIANS EMPLOYMENT AGREEMENT DID IN FACT EXPIRE ON MARCH 31, 2001?

¶24. Next, HeartSouth argues that the chancery court erred by finding that the employment agreement was an expired contract and therefore not valid and enforceable. The thrust of HeartSouth's argument centers around its assertion that some sort of "implied contract" or contract created by "the party actions" existed and thereby operated as a renewal of the employment agreement. HeartSouth argues that, since Boyd did not ask for a new contract and remained an employee of HeartSouth after the lapse of the one year specified in the employment agreement, he acquiesced to its renewal and his actions so create a binding employment contract. HeartSouth also argues that the chancery court's ruling, whether under Rule 12(b)(6) or Rule 56, failed to consider the allegations made by HeartSouth that a valid enforceable contract did exist for which relief may be granted.

13

¶25.    Boyd argues that by the employment agreement's own language, the contract expired almost exactly one year before he decided to "discontinue" his employment relationship with HeartSouth. He further argues, that based on the "employment at will" doctrine, he cannot be forced into an implied contract. Boyd also asserts that under the parol evidence rule and the language of the contract, the employment agreement could not be modified by oral understandings between the parties.

¶26.    As this is an issue of contract construction, simple contract principles apply. The Court's analysis when confronted with the interpretation of a contract is three tiered. "First, the court will attempt to ascertain intent by examining the language contained within the 'four corners' of the instrument in dispute." *Pursue Energy Corp. v. Perkins*, 558 So.2d 349 (Miss. 1990) (citing *Pfisterer v. Noble Cities Serv. Oil Co.*, 320 So.2d 383, 384 (Miss. 1975)).[3]  Second, "[i]f examination solely of the language within the instrument's four corners does not yield a clear understanding of the parties' intent, the court will [implement] . . . applicable 'canons' of construction." *Pursue Energy Corp.*, 558 So.2d at 352, (citing *Clark v. Carter*, 351 So.2d 1333, 1334 & 1336 (Miss. 1977).[4] Third, "if intent remains unascertainable (i.e., the instrument is still considered ambiguous), then the court may resort to [the] . . . consideration of extrinsic or parol evidence." *Pursue Energy Corp.*, 558 So.2d at 353.

## A. FOUR CORNERS OF THE INSTRUMENT.

¶27.    The goal of this Court is to give effect to the intention of the parties. "The general rule is the intention of the parties must be drawn from the words of the whole contract, and if, viewing the language

---

[3] *See also* **Thornhill v. System Fuels, Inc.**, 523 So.2d 983, 998 (Miss. 1988) (holding that it is the duty of a court to construe an instrument as written).

[4] *See also* **St. Regis Paper Co. v. Floyd**, 238 So.2d 740, 744 (Miss. 1970) (holding the court should give great weight to the writing in the instrument when determining intent).

used, it is clear and explicit, then the court must give effect to this contract unless it contravenes public policy." ***Jones v. Miss. Farms Co.***, 116 Miss. 295, 76 So. 880, 884 (1917). "One should look to the 'four corners' of the contract whenever possible to determine how to interpret it." ***Warwick***, 738 So.2d at 214 (citing ***McKee v. McKee***, 568 So.2d 262, 266 (Miss. 1999)). "'Therefore, when interpreting a contract, the court's concern is not nearly so much with what the parties may have intended but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy.'" ***Id*** (quoting ***Simmons v. Bank of Miss.***, 593 So.2d 40, 42-43 (Miss. 1992)). Contracts must be interpreted by objective, not subjective standards, therefore "[c]ourts must ascertain the meaning of the language actually used, and not 'some possible but unexpressed intent of the parties.'" ***IP Timberlands Operating Co. v. Denmiss Corp.***, 726 So.2d 96, 105 (Miss. 1998) (quoting ***Cherry v. Anthony, Gibbs, Sage***, 501 So.2d 416, 416 (Miss. 1987)). The parties disagreement over the meaning of a word or provision, alone, does not render an instrument ambiguous. ***IP Timberlands Operating Co.,*** 726 So.2d at 105 (citing ***Whittington v. Whittington***, 608 So.2d 1274, 1278 (Miss. 1992)).

¶28. Applying these contract principles to the facts leads to the conclusion that the contract between HeartSouth and Boyd was not ambiguous and clearly provided for one year of validity and enforceability. Specifically the "TERM" provision of the employment agreement provided that "[p]hysician agrees to employment with Clinic and to actively pursue a medical practice in the Hattiesburg, Mississippi area **for a period of one year beginning on April 1, 2000** (hereinafter the "Effective Date")." (emphasis added). The contract language clearly provides that the employment agreement is valid for one year of employment which ended on March 31, 2001. No renewal of this agreement was ever executed, and neither party claims that another written contract has been executed. There is also no argument or evidence

15

of any kind concerning an "oral" contract for employment between the parties. Boyd did not discontinue his employment relationship with HeartSouth until March 14, 2002, to be effective on March 18, 2002. This was almost one year after the employment agreement lapsed by its own terms. HeartSouth did not file its complaint for breach of contract until April 16, 2002, which is exactly one year and sixteen days after the employment agreement lapsed.

¶29.    HeartSouth argues that, since the "TERMINATION" clause of the agreement did not provide for termination upon the one year lapse, the agreement is still in force. If HeartSouth wanted to provide for automatic renewal upon lapse, then it should have included such language in its contract. Furthermore, it is absurd to think that a contract such as this does not lapse by its own "terms," but requires a specific provision in the "TERMINATION" provision to that effect. As was stated earlier "[c]ourts must ascertain the meaning of the language actually used, and not 'some possible but unexpressed intent of the parties.' " *IP Timberlands Operating Co.,* 726 So.2d at 105 (quoting *Cherry*, 501 So.2d at 416). The courts are " 'concerned with what contracting parties have said to each, not some secret thought of one [that was] not communicated to the other.' " *Palmere v. Curtis*, 789 So.2d 126, 131 (Miss. Ct. App. 2001) (quoting *Miss. State Highway Comm'n. v. Patterson Enter., Ltd.*, 627 So.2d 261, 263 (Miss. 1993)). Regardless of HeartSouth's "after the fact" intent regarding the lapse of the agreement, it did not so provide for automatic renewal in its contract.

¶30.    Furthermore, HeartSouth's arguments concerning "implied renewal" or a contract created by "the parties' actions" is also without merit and against the mandates provided in the employment agreement. The "Amendments" provision of the employment agreement specifically provides that **"[t]his Physicians Employment Agreement constitutes the entire agreement of the parties and may not be changed orally, but only upon an amendment in writing signed by the parties hereto."**

16

(emphasis added). The agreement clearly provides that an "amendment in writing signed by the parties" is required for the valid change of any term of the contract. The agreement by its own terms may not be changed "orally." This contract language is entirely repugnant to HeartSouth's claims that the agreement was "renewed by implication" or that Boyd's "actions" either support a renewal or a new contractual relationship. Furthermore, HeartSouth's argument that Boyd's actions created a new contract, specifically Boyd's failure to inform it of the lapse of his employment agreement, are without merit.

¶31. Lastly, HeartSouth's argument that the chancery court must view the allegations in the complaint regarding the validity of the employment agreement as true when ruling on a Rule 12(b)(6) motion is also without merit. The chancery court when ruling on a Rule 12(b)(6) motion is only required to take the factual allegations in the complaint as true, the court is not required to take the plaintiffs' version of the legal allegations in the complaint as true. *Tucker*, 558 So.2d at 872 (citing *Davidson*, 622 F.2d at 897). Under the present circumstances, the chancery court had the employment agreement available for review since HeartSouth attached it to the complaint and was free to determine on its own whether "legally" the agreement constituted a valid and enforceable contract.

¶32. Under the four corners rule, there is no ambiguity, and the contract is clear. "When an instrument's substance is determined to be clear and unambiguous, the parties' intent must be effectuated." *Pursue Energy Corp.*, 558 So.2d at 352 (citing *Pfisterer*, 320 So.2d at 384). Since no ambiguity exists, by its own language the employment agreement had in fact lapsed one year before Boyd left HeartSouth and one year and sixteen days before HeartSouth filed its complaint for breach of contract. Since the agreement is not ambiguous, we do not address canons of construction.

**B. PAROL EVIDENCE.**

17

¶33. HeartSouth also attempts to prove "implied renewal" and the creation of a contract by "the parties actions" through the use of parol evidence. HeartSouth asserts that Boyd's actions of not informing HeartSouth of the agreements lapse, continuing to work as if an employment relationship exists, and entering negotiations based on the "ELIGIBILITY TO PURCHASE MEMBERSHIP UNITS" clause; clearly support a finding that a valid employment contract exists. This argument fails for three reasons.

¶34. First, as already stated above, the agreements "Amendments" provision forbids oral modification or any changes to the contract without a written amendment signed by the parties. There has been no written amendment signed by either party; therefore there can be no amendment to the terms of the contract. The agreement in fact lapsed on March 31, 2001.

¶35. Second, as will be discussed further below, HeartSouth's argument is contrary to the "employment at will" doctrine. *See McArn*, 626 So.2d 603. This Court has carved out no exception for the circumstances found herein.

¶36. Third, the employment agreement is not ambiguous; therefore parol evidence as to oral modification or the creation of a contract with differing terms by "implication," cannot be allowed. It is a well settled principle of contract law that parol evidence should never be admitted where the terms of a contract are clear and unambiguous. *Turner*, 799 So.2d at 32 (citing *Estate of Parker v. Dorchack*, 673 So.2d 1379, 1392 (Miss. 1996)). "One of the fundamental principles of contract law is that parol evidence will not be received to vary or alter the terms of a written agreement that is intended to express the entire agreement of the parties on the subject matter at hand." *Housing Auth., City of Laurel v. Gatlin*, 738 So.2d 249, 251 (Miss. Ct. App. 1998) (citing *Grenada Auto Co. v. Waldrop*, 188 Miss. 468, 471, 195 So. 491, 492 (1940); *Perrault v. White Sewing Mach. Co.*, 157 Miss. 167, 176, 127 So.271, 274 (1930); *Edrington v. Stephens*, 148 Miss. 583, 586, 114 So.387, 389 (1927); *Kerr v. Calvit*,

1 Miss. 115, 118 (1822)). " 'Parol evidence as to surrounding circumstances and intent may be brought in where the contract is ambiguous, but where . . . the contract [is] found to be unambiguous it has no place' " *Heritage Cablevision v. New Albany Elec. Power System . . .*, 646 So.2d 1305, 1313 (Miss. 1994) (quoting *Cherry*, 501 So.2d at 419). Additionally, parol evidence has no place until after the court has looked to the four corners of the contract and applied contract canons of construction. *Martin v. Fly Timber Co.,* 825 So.2d 691, 695 (Miss. Ct. App. 2002) (citing *Pursue Energy Corp.*, 558 So.2d at 352)). In *Frierson v. Delta Outdoor, Inc.,* 794 So.2d 220, 224 (Miss. 2001) and *Cooper v. Crabb*, 587 So.2d 236, 241 (Miss. 1991), this Court held that the rule against the admissibility of parol evidence when a contract is unambiguous is "not merely a rule of evidence, but is one of substantive law." Lastly, in *Housing Auth., City of Laurel v. Gatlin*, 738 So.2d 249, 251 (Miss. Ct. App. 1998), held that the parol evidence rule precludes the consideration of evidence which purports to show an oral modification of an employment contract.

## C.  EMPLOYMENT AT WILL DOCTRINE.

¶37.	HeartSouth argues that Boyd is subject to an "implied contract" which was created by the actions of the parties and for which no terms have been written. HeartSouth argues that Boyd's actions created a contract between the parties and therefore subjects him to the terms of the original employment agreement.

¶38.	HeartSouth's argument is contrary to the "employment at will" doctrine. HeartSouth would have this Court hold Boyd subject to an "implied contract" for which no terms exist. It would be repugnant to precedent to allow HeartSouth to hold Boyd liable under a "fictitious" employment contract and impose terms upon him for which he never agreed to abide.

¶39.    Mississippi has followed the "employment at will" doctrine since 1858. *McArn*, 626 So.2d at 606 (citing *Perry v. Sears, Roebuck & Co.*, 508 So.2d 1086, 1088 (Miss. 1987)). The "employment at will" doctrine provides that "an employment contact at will may be terminated by either party with or without justification." *Id.* at 606 (quoting *Kelly v. Miss. Valley Gas Co.*, 397 So.2d 874, 877 (Miss. 1981)). "[A]bsent an employment contract expressly providing to the contrary, an employee may be discharged at the employer's will for good reason, bad reason, or no reason at all, excepting only reasons independently declared legally impermissible." *McArn*, 626 So.2d at 606 (quoting *Shaw v. Burchfield*, 481 So.2d 247, 253-54 (Miss. 1985)). *See also Miss. Employment Sec. Comm'n v. Philadelphia Mun. Separate Sch. Dist.*, 437 So.2d 388, 397 (Miss. 1983)). This Court has only recognized two exceptions in tort to the "doctrine of employment at will" in *McArn* wherein we stated:

> We are of the opinion that there should be in at least two circumstances, a narrow public policy exception to the employment at will doctrine and this should be so whether there is a written contract or not: (1) an employee who refuses to participate in an illegal act as in *Laws [v. Aetna Finance Co.*, 667 F.Supp. 342 (N.D.Miss. 1987),] shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer; (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

626 So.2d at 607.

¶40.    HeartSouth's "implied contract" is contrary to our holdings concerning "employment at will." If this Court found that HeartSouth through the use of parol evidence could prove an "implied contract" and thereby seek damages for the breach of such contract, then employees could also get around the "employment at will" doctrine and sue their employers for breach of an "implied contract" for employment. Under HeartSouth's theory, no assent to be bound is necessary for an "implied contract." All that

HeartSouth argues that is needed is "actions" which are consistent with a contractual relationship. HeartSouth's argument is without merit and contrary to established precedent.

¶41.    In sum, we have stated that " '[t]he right to contract is fundamental to our jurisprudence and absent mutual mistake, fraud and/or illegality, the courts do not have the authority to modify, add to, or subtract from the terms of the contract validly executed between two parties.' " *Wallace v. United Miss. Bank*, 726 So.2d 578, 584 (Miss. 1998). (quoting *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So.2d 861, 864 (Miss. 1983)).  " 'Contracts are solemn obligations and it is not the function of the courts to make contracts for parties, but rather to give effect to them as written.' " *Miller v. Miss. Stone Co.,* 379 So.2d 919 (Miss. 1980) (quoting *Roberts v. Corum*, 236 Miss. 809, 815; 112 So.2d 550, 556 (Miss. 1959)). For these reasons, we cannot at the request of Heartsouth hold Boyd subject to an employment contract that does not exist.

### IV.    DID THE CHANCERY COURT ERR IN FINDING THAT THE COVENANT NOT TO COMPETE/NOT TO SOLICIT DID NOT SURVIVE THE EXPIRATION OF THE EMPLOYMENT AGREEMENT?

¶42. HeartSouth argues that the covenant not to compete/not to solicit survived the lapse  of the employment agreement and supports its breach of contract claim.  It argues that lapse of the agreement had no effect on the covenant's enforceability.

¶43.    Boyd argues that by the employment agreements own terms, the covenant expired upon lapse of the agreement.  He argues that the method of termination or lapse of the agreement is the turning fact which supports the conclusion that the covenant expired on March 31, 2001, along with the other provisions in the employment agreement.

¶44. Again, simple contract law is applicable. As the basic principles have already been stated in Issue III, they need not be fully provided for here. Adopting the three-step process and the rationale discussed in Issue III, leads to the conclusion that the covenant did in fact expire on March 31, 2001, when the entire agreement lapsed. In addition to those arguments discussed in Issue III, HeartSouth presents several new arguments which will be discussed here. Those arguments fully fleshed out in Issue III, will only be referenced.

¶45. First, HeartSouth argues that despite the one year term provided for in the employment agreement, the covenant did not lapse with the agreement. As already stated earlier the covenant's own language provided specifically that **"[i]n the event Clinic terminates this Agreement without cause, Physician terminates this Agreement due to breach by Clinic, of if this Agreement terminates by its own terms without Physician being allowed to become a Member of Clinic; then this covenant not to compete will not be enforced by Clinic and will be deemed null and void."** (emphasis added). By its own terms, the covenant was "deemed null and void" if the "Agreement terminated by its own terms without Physician being allowed to become a Member of the Clinic." This sentence squarely applies to the present circumstances and clearly and unambiguously provides for the termination of the covenant's enforcement upon lapse of the agreement if the physician has not became a member of the clinic. As already discussed, Boyd never became a member of the clinic and the agreement lapsed; therefore the covenant is not valid and enforceable but is "null and void."

¶46. Second, HeartSouth also argues that technically the agreement was never terminated in compliance with the "TERMINATION" provision of the agreement; therefore the covenant did not terminate either. This argument is also without merit. Not only does the covenant expressly provide for lapse of the agreement and the "TERM" provision provide for only a one year term; but the "TERMINATION"

22

provision and its language does not even mention a proper procedure for "termination" upon lapse. As an afterthought, HeartSouth may now feel that they should have included a provision in the "TERMINATION" clause for lapse; but that does not support a finding by this Court that such a provision is and should be part of the contract. If HeartSouth wanted to provide for automatic renewal upon lapse or specific requirements for lapse to effectively terminate the agreement, then it should have included such language in their contract. Furthermore, it is absurd to think that a contract such as this did not lapse by its own "terms," but required a specific provision in the "TERMINATION" provision to that effect. Additionally, even if this Court were to entertain such an absurd assertion; then the applicable canons of construction would force this Court to construe the instrument against HeartSouth, the maker, and find that the employment agreement had in fact terminated by way of lapse on March 31, 2001.

¶47.    Third, by its own terms; in order for the covenant to be invoked and the one year period of no-compete to be initiated; "termination" of the contract is necessary. The agreement states that the covenant is invoked for **"one (1) year immediately following either the voluntary termination by Physician or termination by Clinic of Physician's employment pursuant to this Physician Employment Agreement, with cause."** (emphasis added). The agreement was never "terminated" by either party. The agreement merely lapsed for want of renewal. Furthermore, as "lapse" is not a defined action for the purposes of the "TERMINATION" clause; there can be little doubt that the covenant was not ever intended to be invoked and enforced upon lapse of the employment agreement.

>  V.    **ALTERNATIVELY, DID THE CHANCERY COURT ERR IN FINDING THAT THE COVENANT NOT TO COMPETE/NOT TO SOLICIT IN FACT EXPIRED SIXTEEN (16) DAYS BEFORE THE FILING OF THE COMPLAINT; THEREFORE MAKING DISMISSAL UNDER RULE 12(B)(6) APPROPRIATE?**

**VI.    IS THE COVENANT NOT TO COMPETE/NOT TO SOLICIT CONTRARY TO PUBLIC POLICY AND PATIENTS RIGHTS AND THEREFORE INVALID?**

¶48.    Having already found that the employment agreement terminated by its own terms on March 31, 2001, and that the covenant did not survive the lapse by the terms provided in the contract, we need not discuss these issues.

## CONCLUSION

¶49.    The chancery court did not err in granting Boyd's motion to dismiss for failure to state a claim as the employment agreement upon which HeartSouth's claims were based had in fact lapsed one year before the complaint was filed.  The chancery court did not err in reviewing additional documentation in ruling upon the motion to dismiss.  Furthermore, even assuming the motion to dismiss was more properly a motion for summary judgment; the chancery court still did not err in finding that no disputed issues of genuine material fact existed.  Lastly, the chancery court did not err in finding that the employment agreement in question had in fact expired and was not renewed by "implication."   Therefore, we affirm the learned chancellor's judgment.

¶50.    **AFFIRMED.**

**SMITH, P.J., WALLER, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. PITTMAN, C.J., AND COBB, J., CONCUR IN RESULT ONLY.  DIAZ, J., NOT PARTICIPATING.**